UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| JAVIER JIMENEZ-TREJO,<br><br>Plaintiff,<br><br>vs.<br><br>OFFICER JOHN CLEMENTS, in his official and individual capacity; and the COUNTY OF JEFFERSON, an Idaho political subdivision,<br><br>Defendants. | Case No.: 4:15-cv-00327-REB<br><br>**MEMORANDUM DECISION AND ORDER RE:**<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br>**(Docket No. 23)**<br><br>**DEFENDANTS' MOTION TO EXCLUDE EXPERT WITNESS TESTIMONY**<br>**(Docket No. 28)** |

Now pending before the Court are Defendants' (1) Motion for Summary Judgment (Docket No. 23), and (2) Motion to Exclude Expert Witness Testimony (Docket No. 28). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the undersigned enters the following Memorandum Decision and Order:

## BACKGROUND

On August 31, 2013, Plaintiff Javier Jimenez-Trejo and his friend, Jordan Carter, drove to the Shilo Inn in Idaho Falls, Idaho, with Mr. Carter driving Plaintiff's blue Ford Explorer. When the Shilo Inn closed at 1:00 a.m., Plaintiff and Mr. Carter drove to a convenience store in Idaho Falls (where Plaintiff's wife worked) to purchase cigarettes – again, Mr. Carter drove. After leaving the convenience store, the two then headed for Rexburg, Idaho on Highway 20; however, because Mr. Carter was driving erratically, Plaintiff convinced him to exit Highway 20, stopping in the parking lot of a retail store (Scotty's True Value) in Rigby, Idaho.

**MEMORANDUM DECISION AND ORDER - 1**

Very soon thereafter, Defendant John Clements, a deputy with the Jefferson County Sheriff's Office, arrived and parked behind the Explorer. Deputy Clements believed that Plaintiff (not Mr. Carter) had been driving because of the physical location of each of them when Deputy Clements saw them in the moments leading up to his parking his patrol vehicle behind the Explorer. Specifically, Deputy Clements says that Plaintiff was standing outside the vehicle but near the driver's side door, and Mr. Carter seated in the passenger seat. Plaintiff recounted his interaction with Deputy Clements at his deposition, testifying in relevant part:

Q: And then what happened?

A: Then Officer[1] Clements show up.

Q: Were you in the vehicle or out of the vehicle when Officer Clements arrived?

A: Out of the vehicle.

Q: Where were you at out of the vehicle?

A: Around the driver's side, the side – the driver's side of the car.

Q: How long after you stopped was it before Deputy Clements arrived?

A: About seconds, I guess.

Q: And by the time he arrived, you had gotten out of the vehicle and had gone around to the driver's side of the car; is that what you're telling me?

A: Yes.

Q: Where were you standing when he arrived?

A: When he was talking to us, I was talking to Jordan in the passenger side of the car.

Q: I don't understand. Explain.

---

[1] For the purposes of this Memorandum Decision and Order, the terms "deputy" and "officer" are used interchangeably.

**MEMORANDUM DECISION AND ORDER - 2**

A: I saw Mr. Clements coming and I was walking towards the driver's side. I saw him and I turned around and come back and talked to Jordan. I said: I think we are in trouble. I see the cop right there.

. . . .

Q: So [Deputy Clements] was in his vehicle. You were talking to Jordan at the driver's side of the vehicle, correct – of your vehicle, correct?

A: Yes.

Q: [(From Plaintiff's Counsel)]: I think you said passenger side.

A: When you say Clements arrived, I was talking to Jordan in the passenger side. He was seated on the passenger seat and I was standing outside.

Q: [(From Defendants' Counsel)]: So Jordan was –

A: He got out of the driver's side, walked around and sit in the passenger side.

Q: So Jordan was in the passenger side when Clements arrived, correct?

A: Yes.

Q: And you were standing by the driver's door when –

A: I saw him.

Q: When Clements arrived, correct?

A: No. I was standing in the driver's side when I saw him on the street driving toward us.

Q: So you were standing by the driver's door –

A: Yeah.

Q: – when you first saw Clements's vehicle, correct?

A: Yes.

Q: And Jordan was in the passenger seat?

**MEMORANDUM DECISION AND ORDER - 3**

> A: Yes.
>
> Q: And then Clements stopped, correct?
>
> A: Yes.
>
> Q: And that's when you went back to the car and talked to Jordan some more?
>
> A: Yes.
>
> Q: And told Jordan you thought you guys were in trouble?
>
> A: Yes.
>
> Q: Why did you tell him you thought you were in trouble?
>
> A: Because I know that he will – that Clements will smell the alcohol on him. And there's no way that I can drive without a driver's license.
>
> . . . .
>
> Q: So then what happened?
>
> A: Then Mr. Clements come up, say: "What's going on, guys? I tell the truth. My buddy got sick. He's not feeling so well. Then he pulled us apart and start asking questions.
>
> Q: Okay. Tell me what you recall about your conversation with Clements.
>
> A: He asked me who was driving the car. And I tell him it was Jordan. Then he asked me if I was drinking. I tell him I had three beers. And then he left me by his car and he went and talked to Jordan and asked him the same questions, I believe.

Jimenez-Trejo Dep. at 48:22-51:24, attached as Ex. A to Hall Aff. (Docket No. 23, Att. 5); *see also* Defs.' SOF No. 8 (Docket No. 23, Att. 2); Pl.'s SOF No. 2 (Docket No. 25, Att. 2). In short, after parking in the Scotty's True Value parking lot, Plaintiff and Mr. Carter attempted to switch positions, with (1) Mr. Carter exiting the driver's side of the vehicle before sitting in the passenger's seat, and (2) Plaintiff exiting the passenger's side of the vehicle before walking

**MEMORANDUM DECISION AND ORDER - 4**

towards the driver's side (though he apparently never actually sat down in the driver's seat). Deputy Clements confronted Plaintiff and Mr. Carter in the moments that soon followed.

Believing that Plaintiff was the driver of the Explorer, Deputy Clements performed field sobriety tests on Plaintiff, telling him that his speech was "blurry" and, afterwards, that he failed the field sobriety tests. When informed that he was under arrest for DUI, Plaintiff protested, even convincing the deputy/ies on the scene to call his wife (the clerk at the Idaho Falls convenience store identified above) to confirm that it was Mr. Carter – not Plaintiff – who was driving on the morning of September 1, 2013. However, when called, Plaintiff's wife initially said that her husband (Plaintiff) was the driver, before backtracking and stating that Mr. Carter was the one who was actually driving.

As part of Plaintiff's arrest, Deputy Clements completed a Probable Cause Affidavit, describing the incident and the basis for the arrest as follows:

> On 09-01-2013 at approximately 01:40 Hrs I was traveling west on 1st South. I stopped at the intersection of 1st South and State Street in Rigby, Idaho in Jefferson County. I observed a vehicle pull into the parking lot of Scotty's Hardware Store. I observed a male later identified as Javier Jimenez Trejo DOB 12-24-1980 exit the vehicle from the driver's side of the vehicle. I observed Javier walk towards the passenger side of the vehicle and standing there. I turned onto State Street and drove towards the vehicle. I observed Javier step behind the vehicle and move to where he was not visible. I observed a second male later identified as Jordan Richard Carter DOB 10-06-1982 sitting in the passenger side of the vehicle.
>
> I turned into the parking lot of Scotty's and pulled behind the vehicle. I walked towards the vehicle. I observed both doors of the vehicle were open. I observed Javier was standing outside the vehicle on the passenger side of the vehicle. I observed Jordan was sitting inside the passenger side of the vehicle. I walked to the vehicle and asked Javier what was happening. Javier said Jordan was not feeling right. I could smell the strong odor of an alcoholic beverage on Javier and Jordan. I asked Javier and Jordan for their driver's license.
>
> I asked Javier who was driving. Javier said Jordan was driving because he did not have a driver's license. I asked Jordan who was driving. Jordan looked towards Javier and then away from me and said "me" very quietly. Jordan showed signs of

**MEMORANDUM DECISION AND ORDER - 5**

deception when he said he was driving. I looked at the driver's seat and observed that the seat was in a forward position. I observed that Jordan was approximately 6'06" tall and that Javier was approximately 5'09". I observed that Jordan would not have fit in the driver's seat with it in the location it was at. I confronted Javier about watching him get out of the vehicle. Javier said he was going to the driver's side, not getting out of it.

I returned to my patrol vehicle. I checked driver's status on Javier and Jordan. Dispatch advised that there was no record found on Javier and that Jordan was valid to drive.

I returned to the vehicle. I asked Jordan if he was driving the vehicle. Jordan nodded his head no and then looked and saw Javier and said "yes." I asked Jordan to step out of the vehicle. I walked with Jordan to the rear of the vehicle. I asked Javier to step inside of the vehicle. I closed all the doors so Jordan was not able to be heard by Javier. I again asked Jordan if he was driving the vehicle. Jordan said he was not driving the vehicle. Jordan said that Javier was driving. I asked Jordan why he lied to me. Jordan looked down and did not answer me. I at that time had Jordan get back into the vehicle and had Javier step out with me.

I asked Javier again who was driving. Javier said Jordan was driving. I asked Javier to take standardized field sobriety tests. Javier said he was not driving but would take the tests.

I performed the standardized field sobriety tests. Javier failed the tests. I placed Javier in handcuffs and placed him in the rear seat of my patrol vehicle. I then asked Jordan to step out of the vehicle. I placed Jordan under arrest.

Deputy Andrew Wichmann allowed Javier to call his wife to come get the vehicle. Deputy Wichmann advised me that Javier asked his wife later identified as Dianne Marie Jimenez who was driving the vehicle. Deputy Wichmann said Dianne said you were first and very clearly. Deputy Wichmann said that after Javier spoke with Dianne then she started to say the other guy was driving.

Prob. Cause Aff., attached as Ex. A to Clements Aff. (Docket No. 23, Att. 4); *see also* Defs.'

SOF Nos. 12(a)-(d) (Docket No. 23, Att. 2).[2]

After transporting Plaintiff and Mr. Carter to the Jefferson County Jail, Deputy Clements

performed a breath test on Plaintiff which revealed that Plaintiff was not intoxicated. In turn,

---

[2] Plaintiff does not dispute the contents of Deputy Clements's Probable Cause Affidavit, but does dispute whether they accurately portray the circumstances leading up to Plaintiff's arrest on the morning of September 1, 2013. *See* Pl.'s SOF Nos. 4, 6-7 (Docket No. 25, Att. 2).

**MEMORANDUM DECISION AND ORDER - 6**

Plaintiff's original DUI charge was changed to one count of driving without a license and one count of providing false information to police officers. Plaintiff was then incarcerated in the Jefferson County Jail for three nights before being released on bond at his September 4, 2013 arraignment.

At a pre-trial conference on September 30, 2013, Plaintiff presented a surveillance video from Scotty's True Value which revealed that Plaintiff had, in fact, not been the driver of the Explorer. All charges against Plaintiff were then dismissed, with prejudice, by the prosecuting attorney.

Plaintiff is now suing Deputy Clements and Jefferson County, alleging § 1983 claims of wrongful arrest, malicious prosecution, and failure to train and/or supervise. Defendants' pending Motion for Summary Judgment seeks the dismissal of each of these claims.

## DISCUSSION

A.  **Summary Judgment Standard**

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-34 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). There must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248. Disputes over facts that are not material to the resolution of the motion will not preclude summary judgment. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

The moving party is entitled to summary judgment if that party shows that each material fact cannot be disputed. To show that the material facts are not in dispute, a party may cite to particular parts of materials in the record, or show that the adverse party is unable to produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial responsibility, then the burden shifts to the opposing party to establish that a genuine dispute as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986). The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson,* 477 U.S. at 252.

B.  **Deputy Clements and Plaintiff's Wrongful Arrest Claim**

    1.    <u>Section 1983 and Qualified Immunity</u>

One purpose of 42 U.S.C. § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally-guaranteed rights, and to provide relief to harmed parties. *See Wyatt v. Cole*, 504 U.S. 158, 161 (1992). To state a claim under

Section 1983, a plaintiff must allege that a person acting under color of state law violated his rights protected by the Constitution or created by a federal statute. *See Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). However, in Section 1983 actions, the doctrine of qualified immunity protects state officials from personal liability for on-the-job conduct so long as the conduct is objectively reasonable and does not violate clearly-established federal rights. *See Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Conversely, a state official may be held personally liable in a Section 1983 action if he knew or should have known that he was violating a plaintiff's clearly-established federal rights. *See id*. True to its dual purposes of protecting state actors who act in good faith and redressing clear wrongs caused by state actors, the qualified immunity standard "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

A qualified immunity analysis consists of two prongs: (1) whether the facts alleged "[t]aken in the light most favorable to the party asserting the injury, . . . show the [defendant's] conduct violated a constitutional right"; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *C.B. v. City of Sonora*, 730 F.3d 816, 825 (9th Cir. 2013).[3] Thus, qualified immunity operates to ensure that a government official is on notice that his conduct is unlawful, before he is subject to suit. *Pearson*, 555 U.S. at 244 (citing *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

Whether a right was clearly established must be considered "in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201. For the law to

---

[3] Courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

**MEMORANDUM DECISION AND ORDER - 9**

be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). It is not required that the "very action in question has previously been held unlawful," but "in the light of pre-existing law the unlawfulness must be apparent" to the official. *Id*. "The relevant, dispositive inquiry is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments.'" *City and Cnty. of San Francisco, Calif. v. Sheehan*, 135 S.Ct. 1765, 1774 (2015) (quoting *Ashcroft v. al-Kidd*, 131 S.Ct. 1765, 2085 (2011)). The plaintiff bears the burden of establishing the rights violated were "clearly established." *Houghton v. South*, 965 F.2d 1532, 1534 (9th Cir. 1992).

  2. <u>Probable Cause to Arrest Plaintiff</u>

  The Fourth Amendment right to be secure from unreasonable searches and seizures "applies to all seizures of the person," including initial and brief stops falling short of traditional arrest. *See United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007) (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 878 (1965)). Arrests made without a warrant are unreasonable, and therefore violate the Fourth Amendment, *if* conducted without probable cause. *See Beauregard v. Wingard*, 362 F.2d 901, 903 (9th Cir. 1966) ("[W]here probable cause does exist, civil rights are not violated by an arrest even though innocence may subsequently be established.").

  The question of whether an officer has qualified immunity from a false arrest claim rests upon "(1) whether there was probable cause for [Plaintiff's] arrest; [and, if not,] (2) whether it is *reasonably arguable* that there was probable cause for arrest – that is, whether reasonable

**MEMORANDUM DECISION AND ORDER - 10**

officers could disagree as to the legality of the arrest such that the arresting officer is entitled to qualified immunity." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1076 (9th Cir. 2011) (emphasis in original) (citing *Jenkins v. City of New York*, 478 F.3d 76, 87 (2nd Cir. 2007)). An officer will not be entitled to qualified immunity "if officers of reasonable competence would have to agree that the information possessed by the officer at the time of arrest did not add up to probable cause . . . ." *Jenkins*, 478 F.3d at 87. Here, Deputy Clements arrested Plaintiff without a warrant. Therefore, he is entitled to qualified immunity only if he acted with either actual or arguable probable cause.

"Probable cause for a warrantless arrest arises when the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person to believe that the suspect has committed an offense." *Crowe v. Cnty. of San Diego*, 608 F.3d 406, 432 (9th Cir. 2010) (internal alterations omitted). The probable cause standard is a "practical, non-technical conception." *Brinegar v. United States*, 338 U.S. 160, 176 (1949). The inquiry is two-fold: first, a court must determine "historical facts," that is, the events leading up to the stop or search; second, the court must determine "whether those historical facts, viewed from the standpoint of the reasonable police officer," amount to probable cause. *Ornelas v. United States*, 517 U.S. 690, 696 (1996).

Importantly, "[t]he validity of the arrest does not depend on whether the suspect actually committed the crime; the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest" – that is, "the kinds and degree of proof and the procedural requirements necessary for a conviction are not prerequisites to a valid arrest." *Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979) (citing *Gerstein v. Pugh*, 420 U.S. 103, 119-23 (1975)). Rather, "[b]ecause the probable cause standard is objective, probable cause supports an

**MEMORANDUM DECISION AND ORDER - 11**

arrest so long as the arresting officers ha[ve] probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." *Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 954 (9th Cir. 2010) (citing *Devenpeck v. Alford*, 543 U.S. 146, 153-55 (2004)). "Probable cause to arrest or detain is an absolute defense to any claim under § 1983 against officers for wrongful arrest or false imprisonment, as the lack of probable cause is a necessary element of each." *Lacy v. Cnty of Maricopa*, 631 F. Supp. 2d 1183, 1193 (D. Ariz. 2008).[4]

Here, even when viewed most favorably to Plaintiff, the facts show that Deputy Clements reasonably believed that he had probable cause to arrest Plaintiff for DUI. It is true, as Plaintiff points out, that Deputy Clements could not have *actually seen* Plaintiff exit the Explorer's driver's side door; thus, his statement to that effect within his Probable Cause Affidavit is not completely accurate (and troubling). But this inaccuracy does not overcome what Deputy Clements indisputably encountered in the early morning hours of September 1, 2013 – indeed, the same circumstances informing Deputy Clements's Probable Cause Affidavit.

The relevant events occurred at approximately 2 a.m. on September 1, 2013 (Labor Day weekend). Deputy Clements saw a vehicle (the Explorer, registered to Plaintiff) parked in front

---

[4] Distinct from probable cause, when an officer has "reasonable suspicion" that criminal activity may be afoot, the officer may conduct a limited seizure and briefly detain a person for investigative purposes" – a *Terry* stop. *Terry v. Ohio*, 392 U.S. 1, 30-31 (1968). "Reasonable suspicion" is an abstract concept, requiring more than a mere hunch, but less than probable cause. *See Buck v. City of Sandpoint*, 2008 WL 4498806, *9 (D. Idaho 2008) (citing *Smoak v. Hall*, 460 F.3d 768, 778-79 (6th Cir. 2006)). An officer has "reasonable suspicion" when he can articulate facts to support the notion that "'criminal activity may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). "The officer, of course, must be able to articulate something more than an 'inchoate and unparticularized suspicion or hunch.'" *Id*. (quoting *Terry*, 392 U.S. at 27). There is no real argument that Deputy Clements did not have the requisite reasonably suspicion to effectuate a *Terry* stop and temporarily detain Plaintiff; instead, the question is whether Deputy Clements had probable cause to later arrest Plaintiff.

**MEMORANDUM DECISION AND ORDER - 12**

of a closed hardware store. He initially saw Plaintiff outside the Explorer's driver's side door,[5] and then saw Plaintiff walk around to the passenger's side door where another man, Mr. Carter, was already seated in the passenger seat. In this setting, it was reasonable for Deputy Clements (or any other police officer) to suspect that Plaintiff had been driving the Explorer. Moreover, at some point when questioning the two men, Mr. Carter suggested (though not consistently) that Plaintiff was driving. That was followed by Plaintiff's wife also stating (at least at first) that Plaintiff was the driver. Smelling alcohol, witnessing slurred speech, and legitimately believing Plaintiff to be the driver of the Explorer, Deputy Clements then performed field sobriety tests on Plaintiff. He later arrested Plaintiff on three charges: DUI, providing false information to police officers (Plaintiff denied he was driving), and for driving without a license.

It was clearly established law at the time of Plaintiff's arrest that Deputy Clements must have probable cause to execute a warrantless arrest. The historical facts surrounding the arrest establish probable cause for Plaintiff's arrest on the crimes charged. There are no disputed facts upon which a jury could reasonably find Deputy Clements lacked probable cause to arrest Plaintiff, and therefore Plaintiff's wrongful arrest claim fails. *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998) ("To prevail on his § 1983 claim for false arrest and imprisonment, [plaintiff] would have to demonstrate that there was no probable cause to arrest him."). There is no constitutional violation, and accordingly, Plaintiff cannot succeed on his

---

[5] The undersigned has reviewed the surveillance video from Scotty's True Value. Although it confirms that Plaintiff was not driving the Explorer, Deputy Clements's arrival on the scene was not so contemporaneous with Mr. Carter and Plaintiff pulling into the hardware store's parking lot that Deputy Clements knew or should have known that Plaintiff was not driving. Instead, enough time had passed from the Explorer first pulling into the parking lot to when Deputy Clements arrived that, as between Mr. Carter and Plaintiff, Deputy Clements only saw Plaintiff near the driver's side door – not Mr. Carter.

**MEMORANDUM DECISION AND ORDER - 13**

Section 1983 claim. Therefore, the Court need not address Deputy Clements's qualified immunity defense.[6] Defendants' Motion for Summary Judgment is granted in this respect.

**C.     Deputy Clements and Plaintiff's Malicious Prosecution Claim**

Malicious prosecution actions are not limited to suits against prosecutors, but may be brought against other persons who have wrongfully caused the charges to be filed. *See Galbraith v. County of Santa Clara*, 307 F.3d 1119, 1126-27 (9th Cir. 2002).

There is a rebuttable presumption that a prosecutor exercises independent judgment in deciding to file criminal charges, thus immunizing the investigating officers from liability for injuries allegedly suffered after the charging decision. *See Smiddy v. Varney*, 665 F.2d 261 (9th Cir. 1981), *overruled on other grounds*, *Beck v. City of Upland*, 527 F.3d 853 (9th Cir. 2008). This presumption is rebutted with evidence that officers "improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in bad faith conduct that was actively instrumental in causing the initiation of legal proceedings." *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004). "Such evidence must be substantial." *Harper v. City of Los Angeles*, 533 F.3d 1010, 1027 (9th Cir. 2008). But, regardless of whether this presumption applies, "officers may always be held liable if they acted 'maliciously or with reckless disregard for' the plaintiffs' rights." *Johns v. City of Eugene*, 2017 WL 663092 (D. Or. 2017) (quoting *Smiddy*, 665 F.2d at 266-67).

Here, Deputy Clements had probable cause to arrest Plaintiff – or, at least, arguably had probable cause to arrest Plaintiff. *See supra*. Accordingly, there is no evidence – substantial or

---

[6] However, even when assuming that no probable cause existed (such that a constitutional violation did occur), it is reasonably arguable that probable cause did exist in light of the circumstances presented (such that there is no basis to conclude that the violation was clearly established). Accordingly, at the very least, Deputy Clements is entitled to qualified immunity.

**MEMORANDUM DECISION AND ORDER - 14**

otherwise – that Deputy Clements exerted undue influence over, or provided false information to, the prosecuting attorney in Plaintiff's case. Thus, there is nothing to rebut the presumption that the prosecuting attorney exercised independent judgment in reaching his findings – a conclusion buttressed by the fact that the charges against Plaintiff were dropped once the True Hardware store surveillance video became known to the prosecuting attorney. *See, e.g.*, *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1189 (9th Cir. 1995) ("[T]he mere fact a prosecution was unsuccessful does not mean it was not supported by probable cause."). Likewise, owing to the (arguable) existence of probable cause, it cannot be said that Deputy Clements acted maliciously or in reckless disregard for Plaintiff's rights. Plaintiff's malicious prosecution claim therefore fails as a matter of law. Defendants' Motion for Summary Judgment is granted in this respect.

D.  **Jefferson County and Plaintiff's Section 1983 Claim**

Liability of a government entity under 42 U.S.C. § 1983 requires that a policy, practice, or custom of the entity can be shown to be a moving force behind a violation of constitutional rights. *See Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 694 (1978). This well-established *Monell* standard requires proof "(1) that [the] plaintiff possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy amounts to deliberate indifference to the plaintiff's constitutional right; and (4) that the policy is the moving force behind the constitutional violation." *Plumeau v. Sch. Dist. No. 40 Cnty. of Yamhill*, 130 F.3d 432, 438 (9th Cir. 1997).

An unwritten policy or custom will meet the "policy" requirement only if it is so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691. "Liability for improper custom may not be predicated on isolated or sporadic

**MEMORANDUM DECISION AND ORDER - 15**

incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). Nonetheless, a municipality "may be held liable under [Section] 1983 when the individual who committed the constitutional tort was an official with final policy-making authority or such an official ratified a subordinate's unconstitutional decision or action and the basis for it." *Clouthier v. Cnty. of Contra Costa*, 591 F.3d 1232, 1250 (9th Cir. 2010).

Plaintiff contends that the county ratified Deputy Clements's actions. Opp. to MSJ, p. 13 (Docket No. 25, Att. 1); *see also id*. at p. 14 ("Sheriff Anderson has knowledge of improper actions of Deputy Clements but has ratified those actions instead, stating that Deputy Clements did not violate policy of the Jefferson County Sheriff's Office."). The Court is not persuaded.

First, given the existence of probable cause, there is no constitutional violation. *See supra*. Absent a constitutional violation, there can be no municipal liability under Section 1983 and *Monell*. *See Villegas v. Gilroy Garlic Festival Ass'n*, 541 F.3d 950, 957 (9th Cir. 2008) (where "there is no constitutional violation, there can be no municipal liability."); *Scott v. Henrich*, 39 F.3d 912, 916 (9th Cir. 1994) ("While the liability of municipalities doesn't turn on the liability of individual officers, it is contingent on a violation of constitutional rights. Here, the municipal defendants cannot be held liable because no constitutional violation occurred.").

Second, setting aside the existence of probable cause, there is no evidence that Sheriff Anderson (the apparent final policy-maker in this instance) was ever aware of Deputy Clements's conduct leading up to Plaintiff's arrest before the charges against Plaintiff were dismissed. Therefore, Sheriff Anderson could not have ratified Deputy Clements's actions so as to impose liability upon Jefferson County. *See Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir.

1999) ("Christie provided no evidence, in conjunction with his summary judgment motion, that Kimura knew of Iopa's actions before the criminal case against him was dismissed (i.e., before the alleged constitutional violations ceased)."). That being so, Christie has not established a genuine issue of material fact as to the question whether Kimura ratified Iopa's actions."). Plaintiff's Section 1983 claim against Jefferson County therefore fails as a matter of law. Defendants' Motion for Summary Judgment is granted in this respect.[7]

## ORDER

Based on the foregoing, IT IS HEREBY ORDERED that:

1. Defendants' Motion for Summary Judgment (Docket No. 23) is GRANTED; and

2. Defendants' Motion to Exclude Expert Witness Testimony (Docket No. 28) is DENIED AS MOOT.



DATED: **July 3, 2017**

Honorable Ronald E. Bush
Chief U. S. Magistrate Judge

---

[7] Because the Court has granted Defendants' Motion for Summary Judgment, there is no need for the Court to consider Defendants' Motion to Exclude Expert Witness Testimony. It is therefore denied as moot.

**MEMORANDUM DECISION AND ORDER - 17**